# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| ALLEGRA MORGADO, Derivatively on Behalf of Nominal Defendant TORRID HOLDINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> LISA HARPER,  ELIZABETH MUÑOZ, STEFAN L. KALUZNY, DARY KOPELIOFF, THEOPHLIUS KILLION, VALERIA RICO NIKOLOV, MICHAEL SHAFFER, and GEORGE WEHLITZ <br><br> Defendants, <br><br> and <br><br> TORRID HOLDINGS INC., <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. _____ |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Allegra Morgado ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Torrid Holdings Inc. (herein referred to as "Torrid" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents,

---

[1] The "Individual Defendants" are defined *infra* in ¶33.

including the allegations of the amended consolidated class action complaint filed in a securities class action, captioned *Waswick v. Torrid Holdings, Inc. et al,* Case No.: 2:22-cv-08375 (C.D. Cal. Nov. 16, 2022) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Torrid, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Torrid against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least July 1, 2021, and December 8, 2022, inclusive (the "Relevant Period") and violations of the federal securities laws caused by the issuance of materially false and misleading statements in connection with, among other things, the Company's initial public offering (the "IPO"). These statements have exposed the Company to massive class-wide liability, as well as the expenditure of substantial defense costs in connection with the Securities Class Action, as set forth below.

2.     Torrid is a fashion retailer headquartered in City of Industry, California and incorporated in Delaware that specializes in plus-size apparel. Torrid sells its products directly to consumers through an e-Commerce platform and through more than 600 physical stores located throughout the United States, Canada, and Puerto Rico. The Company is controlled by its majority shareholder, Sycamore Partners Management, L.P. ("Sycamore"), a New York based private equity firm.

3.     Torrid went public via IPO on July 1, 2021, raising $265 million in proceeds from investors. In most traditional IPOs, the proceeds raised from the issuance of stock are invested into the Company. Here, however, the vast majority of the proceeds went directly to Company insiders,

including then-Chief Executive Officer ("CEO") Elizabeth Muñoz ("Muñoz"), former Chief Financial Officer ("CFO") George Wehlitz ("Wehlitz"), and current-CEO Lisa Harper ("Harper").

4.      To generate investor interest in the IPO, Company insiders issued false and misleading statements, touting Torrid's "data-driven, low-risk merchandising" model and claiming that the Company was resistant to industry-wide supply chain disruptions caused by the COVID-19 pandemic.

5.      In reality, prior to the IPO, Torrid had been experiencing severe shipment delays due to port congestion and COVID-19-related factory closures. Further, as a result of a lack of storage capacity and sufficient personnel at the Company's Jefferson, Ohio distribution center (the "Distribution Center"), the shipment delays were causing an accumulation of excess inventory that could not be processed in a timely fashion or be used to fulfill customer orders.

6.      Further, prior to the IPO, Torrid had abandoned its data-driven, low-risk merchandising model, which had provided the Company with the flexibility to adjust to changing sales trends. This compounded the issue of increasing manufacturing lead-times and forced the Company to purchase greater volumes of inventory upfront and further exceed its manufacturing levels.

7.      As a result of these undisclosed internal conditions, after the IPO and throughout 2022, the Company was forced to engage in promotional activities aimed at offloading excess inventory at discounted prices, driving down Torrid's margins and profitability.

8.      While the Individual Defendants continued to mislead the public about Torrid's inventory management issues, the truth gradually emerged through a series of partially corrective disclosures beginning in December 2021. By the end of the Relevant Period, on December 9, 2022, the price of Torrid's stock had declined 84% from the IPO price of $21 per share.

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.      As a result of the foregoing, the Securities Class Action was filed against the Company and certain current and former officers and members of the Board, exposing the Company to massive class-wide liability.

12.      In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

13.      Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Torrid's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with

the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under §§11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k and 77l(a)(2)), and §§10(b) and 20A of the Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act over the claims asserted herein.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District, and Torrid is incorporated within this District.

## PARTIES

*Plaintiff*

20. Plaintiff is, and has been at all relevant times, a continuous shareholder of Torrid

common stock.

*Nominal Defendant*

21.     Nominal Defendant Torrid is incorporated under the laws of the State of Delaware. The Company's principal executive offices are located at 18501 East San Jose Avenue, City of Industry, California 91748.  Torrid's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CURV."

*Director Defendants*

22.     Defendant Harper has served as Torrid's CEO since May 2022 and as a member of the Board since 2008. From March 2011 until June 2016, Harper served as CEO of Hot Topic, Inc. ("Hot Topic"), Torrid's former parent company. Defendant Harper serves as a member of the Nominating and Corporate Governance Committee. Defendant Harper sold more than $14 million worth of her personal shares of Torrid stock in the IPO. According to the Company's public filings, Harper received $100,000 in 2021 and $1,742,696 in 2022 in compensation from the Company.

23.     Defendant Muñoz served as Torrid's CEO and as a member of the Board prior to the IPO. Prior to serving as CEO, Muñoz served in various roles at the Company including as Torrid's President and as Torrid's Senior Vice President of Product. Defendant Muñoz sold roughly $5 million worth of her personal shares of Torrid stock in the IPO, and a total of more $6,295,411.370 during the Relevant Period. In May 2022, Torrid announced that Defendant Muñoz had resigned as CEO and as a member of the Board and was assuming a new role as the Company's Chief Creative Officer. According to the Company's public filings, Muñoz received $39,956,898 in 2021 and $918,514 in 2022 in compensation from the Company.

24.     Defendant Michael Shaffer ("Shaffer") has served as a member of the Board since May 2022 and serves as chair of the Audit Committee. According to the Company's public filings,

Shaffer received $187,646 in 2022 in compensation from the Company.

25.    Defendant Valeria Rico Nikolov ("Nikolov") has served as a member of the Board since September 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Nikolov received $195,982 in 2021 and $225,000 in 2022 in compensation from the Company.

26.    Defendant Theophlius Killion ("Killion") has served as a member of the Board since June 2021. Defendant Killion serves as Lead Independent Director and as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Killion received $159,824 in 2021 and $229,090 in 2022 in compensation from the Company.

27.    Defendant Stefan L. Kaluzny ("Kaluzny") has served as a member of the Board since 2013 and as Chairperson of the board since July 2021. Defendant Kaluzny serves as a member of the Nominating and Corporate Governance Committee and as chair of the Compensation Committee. Kaluzny is co-founder and Managing Director of Sycamore, Torrid's controlling shareholder before, during, and after the IPO. In the IPO, Sycamore sold more than $210 million worth Torrid stock.

28.    Defendant Dary Kopelioff ("Kopelioff") has served as a member of the Board since 2018. Kopelioff serves as a member of the Compensation Committee and the Audit Committee and as chair of the Nominating and Corporate Governance Committee. Kopelioff serves as a Managing Director of Sycamore.

29.    Defendants Kaluzny and Kopelioff are herein referred to as the "Sycamore Defendants."

30.    Defendants Harper, Shaffer, Nikolov, Killion, Kaluzny, and Kopelioff are herein referred to as the "Director Defendants."

*Officer Defendant*

31.    Defendant Wehlitz served as Torrid's CFO prior to and at the time of the IPO. Shortly after the IPO, in December 2021, the Company announced that Wehlitz was retiring, effective May 2022. Defendant Wehlitz sold more than $4 million worth of his personal shares of Torrid stock in the IPO. According to the Company's public filings, Wehlitz received $24,955,094 in 2021 in compensation from the Company.

32.    Defendants Muñoz, Harper, Kaluzny, Kopelioff, and Wehlitz are herein referred to as the "Insider Trading Defendants."

33.    Defendants Muñoz, Harper, Shaffer, Nikolov, Killion, Kaluzny, Kopelioff, and Wehlitz are herein referred to as the "Individual Defendants."

*Non-Party Confidential Witnesses*

34.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Consolidated Class Action Complaint (the "Amended Complaint") in the Securities Class Action, which contains detailed allegations based on interviews with two former Torrid employees (referred to herein as FE 1 and FE 2) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

35.    FE 1 worked at Torrid's Distribution Center between December 2019 and March 2022 as an Inventory Control ("IC") and Audit Specialist, tasked with tracking inventory that was received at the Distribution Center. FE 1 monitored the Company's warehouse management system ("WMS") on a daily basis, working with the Warehouse Management System Administrator to identify errors in the system and sending daily updates to Company management

8

in City of Industry, California. FE 1 further managed the Company's distribution of employee identification cards at the Distribution Center.

36.    According to FE 1, in the months preceding the IPO, the Company had been experiencing significant shipment delays from its manufacturers. FE 1 recalled that the Distribution Center lacked the needed personnel to process the flow of inventory, exacerbating the shipment delays and causing millions of customer orders to remain unfulfilled for months leading up to the IPO. FE 1 further recalled as many as 50 or 60 trailers full of unprocessed inventory parked at the Distribution Center at certain points during his time with the Company. FE 1 explained that the unprocessed inventory would not move until promotional activities, including "flash sales," during which the Company would offload its excess inventory at deeply discounted prices.

37.    FE 2 began working at Torrid's Distribution Center in April 2019, serving as Operations Supervisor until December 2020, thereafter working as WMS Administrator/IC Supervisor until FE 2's departure from the Company in November 2022. FE 2 managed a team that tracked inventory in the Distribution Center and submitted periodic reports to Torrid headquarters. After the IPO, the amount of inventory at Torrid's Distribution Center had nearly doubled, in part due to late deliveries of inventory. FE 2 recalls that the Distribution Center lacked sufficient capacity to process the late deliveries, and at one point, there were 500,000 units of inventory stacked on pallets on the floor of the Distribution Center. FE 2 further recalls around 40 trailers parked in the lot of the Distribution Center. Each trailer had the capacity to hold up to 1,000 cartons—each carton could hold roughly 30 units of inventory.  In some cases, the inventory in the trailers was not received in the Distribution Center until the following quarter. According to FE 2, delayed shipments and resource constraints at the Distribution Center prevented the

Company from being able to receive new seasonal inventory. FE 2 confirmed FE 1's account that high employee turnover at the Distribution Center caused further inefficiencies at the Distribution Center.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

38.     By reason of their positions as officers and/or directors of Torrid, and because of their ability to control the business and corporate affairs of Torrid, the Individual Defendants owed Torrid and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Torrid in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Torrid and its shareholders.

39.     Each director and officer of the Company owes to Torrid and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Torrid, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of Torrid were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Torrid, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44.     To discharge their duties, the officers and directors of Torrid were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Torrid were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Torrid's own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how Torrid conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Torrid and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Torrid's operations would comply with all applicable laws and Torrid's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

45.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Torrid.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Torrid and were at all times acting within the course and scope of such agency.

47.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## TORRID'S CODE OF BUSINESS CONDUCT AND ETHICS

48.     Torrid's Code of Business Conduct and Ethics (the "Code of Conduct") applies to "[a]ll directors, officers, and employees" of the Company, and violations of the Code of Conduct will result in "disciplinary action . . . including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities."

49.     The purpose of the Code of Conduct is to promote:

1.  honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

2.  full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

3.  compliance with applicable governmental laws, rules and regulations

4.  the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

5.  accountability for adherence to the Code.

50.     In a section titled "HONEST AND ETHICAL CONDUCT," the Code of Conduct states that:

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest

ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

51.    In a section titled "PROTECTION AND PROPER USE OF COMPANY ASSETS," the Code of Conduct states, in relevant part:

All directors, officers and employees should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability and are prohibited.

All Company assets should be used only for legitimate business purposes. Any suspected incident of fraud or theft should be reported for investigation immediately.

52.    In a section titled "COMPLIANCE," the Code of Conduct states, in relevant part, that "[d]irectors, officers and employees should comply, both in letter and spirit with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates. . . . Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy." *Id.*

53.    In a section titled "DISCLOSURE," the Code of Conduct states:

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

1.  be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

## **TORRID'S AUDIT COMMITTEE CHARTER**

54.     Pursuant to Torrid's Audit Committee Charter, "[t]he primary responsibility of the [Audit] Committee is to oversee the Company's accounting and financial reporting processes on behalf of the Board and report the results of its activities to the Board."

55.     Torrid's Audit Committee Charter further states that the Audit Committee shall:

[P]rovide assistance to the Board in fulfilling its oversight responsibility relating to:

- the integrity of the Company's financial statements and its accounting and financial reporting processes;
- the systems of internal accounting and financial controls;
- the Company's risk management procedures;
- the performance of the Company's internal audit function, if any, and independent auditor;
- the independent auditor's qualifications and independence; and
- the Company's compliance with legal and regulatory requirements.

56.     The Audit Committee Charter provides that the Audit Committee shall:

[R]eview and discuss policies and guidelines with respect to risk assessment and risk management, including the risk of fraud. The Committee shall also discuss the Company's major financial risk exposures, including with respect to its banking practices and cash management / investing policies, and the steps management has taken to monitor and control such exposure.

57.     The Audit Committee Charter further states that the Audit Committee will "review with the full Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements . . . and, to the extent an internal audit function is established, the performance of the internal audit function."

## SUBSTANTIVE ALLEGATIONS

### *Background*

58.    Torrid is a plus-size clothing brand formerly owned by Hot Topic. Sycamore acquired Hot Topic and the Torrid brand in 2013. In 2015, while still owned by Sycamore, Torrid branched off to become a standalone company, financially and operationally distinct from Hot Topic.

59.    According to the Individual Defendants, Torrid was one of the fastest growing direct-to-consumer brands in the plus-size apparel and intimates market in the years leading up to the IPO, with net sales growing at an annual compounded rate of 8% between 2017 and 2020.

60.    Acquired in 2018, the Distribution Center was central to the Company's operations. Torrid houses all of its inventory at the Distribution Center and fulfills all of its e-Commerce orders there. Torrid's e-Commerce orders account for 70% of the Company's sales.

61.    Accordingly, Torrid's growth was dependent on the Distribution Center's capacity to support the Company's operations and inventory flow. On June 7, 2021, the Company filed a registration statement with the SEC in connections with the IPO (the "Registration Statement"). The Registration Statement touted the Distribution Center as a state-of-the-art facility capable of handling Torrid's existing and future operational needs.

62.    Torrid sells "Basic" and "Core" products throughout the year, with new lines of merchandise introduced roughly sixteen times per year. All of Torrid's merchandise can be categorized into one of these three groups.

63.    Basic styles refer to proven silhouettes in basic colors that are consistent best-sellers. Core styles refer to seasonal best-sellers with silhouettes that resemble the Basic styles. New products use proven silhouettes but experiment with more elaborate patterns and prints.

Torrid's Basic, Core, and new products accounted for 19%, 67%, and 14% of Torrid's merchandise, respectively.

64.    The Distribution Center utilized a WMS, known as Highjump, to monitor the Company's inventory and fulfill orders. New inventory would typically arrive at the Distribution Center in trailer trucks, and Torrid's standard process for receiving the inventory involved recording it in the WMS so that it could be tracked electronically from the time it was scanned through sale. The WMS further had a 25-part Key Performance Indicator ("KPI") dashboard that generated inventory reports to which Torrid's executives had access.

65.    At the time of the IPO, Torrid sourced roughly 96% of its merchandise from abroad, primarily from manufacturers in Asia-Pacific.

***Prior to the Relevant Period, Torrid Had Already Abandoned an IPO Due to Inventory Management Issues***

66.    Torrid had been experiencing inventory issues for years leading up to the Relevant Period. Indeed, inventory issues precluded the Individual Defendants from taking the Company public in 2017.

67.    In July 2017, the Individual Defendants filed a Registration Statement with the SEC in connection with an IPO (the "2017 Registration Statement"). In April 2019, however, the Individual Defendants withdrew the 2017 Registration Statement as a result of inventory management issues, stating at the time: "The Company believes that the withdrawal of the Registration Statement would be consistent with the public interest and the protection of investors."

68.    On July 1, 2021, in an article published on the day of Torrid's IPO, retail news site *Chain Store Age* summarized Defendant Munoz's justification for the withdrawal of the 2017 Registration Statement as follows: "Torrid had experienced skyrocketing growth year over year

but, as sometimes happens, it had skipped some critical steps that would become important at some

point," and "Among other things, the chain had an inventory problem. And its IT functions were

still being handled by Hot Topic."[2]

69.    The article quoted Muñoz explaining further that:

> We didn't have our head around inventory management. We had no targets or
> disciplines around how we acquired inventory. And as a product person, I felt there
> was a constant proliferation of SKUs. So with not having our inventory problem
> sorted out, and not having all the right leadership in place, we pulled the filing. It
> just didn't feel like the right time.

***Torrid's Data-Driven Merchandising Model***

70.    Torrid's IPO occurred during the COVID-19 pandemic. To generate investor

interest, the Individual Defendants touted the Company's business model, which purportedly

allowed Torrid to grow sales despite industry-wide supply chain headwinds related to the COVID-

19 pandemic. Torrid distinguished itself from its competitors by highlighting its better fitting

proprietary product and its "data-driven, low-risk merchandising model," claiming that both were

fueling the Company's growing profits and margins.

71.    Pursuant to the Company's "data-driven, low-risk merchandising model," Torrid

gathered and analyzed data from its customer loyalty program to evaluate market trends, allowing

the Company to adjust its inventory purchasing decisions according to the latest sales trends.

72.    The Individual Defendants claimed that Torrid's low-risk merchandising model

implemented a system referred to as "read-and-react," in which the Company would purchase

small quantities of a new style before scaling up production in case the product ultimately

performed poorly, thereby minimizing inventory risk. The Individual Defendants further claimed

---

[2] *See* Marianne Wilson, *Exclusive: Torrid CEO sees plenty of room for growth*, Chain Store Age
(July 1, 2021), https://chainstoreage.com/exclusive- torrid-ceo-sees-plenty-room-growth.

that Torrid's low-risk merchandising model allowed the Company to generate roughly 80% of its net sales from products sold at regular prices.

73.    The Individual Defendants also partially attributed Torrid's pre-IPO growth rates to the Company's supply chain flexibility, referred to as the "speed model," drastically reducing the time it takes to bring new fashion products to market with the use of data analytics.

74.    Indeed, the Individual Defendants stated that in response to supply chain issues related to the COVID-19 pandemic, the Company took steps to improve its speed model "shorten[ing its] development cycle by two weeks" through "targeted investments and changes to [its] process to improve the speed and flexibility of [its] supply chain."

75.    During the Company's roadshow in the run-up to the IPO (the "Roadshow"), Torrid reiterated the Company's purported resiliency to the COVID-19-related supply chain disruptions affecting other retailers, attributing Torrid's late-2020 sales growth to the Company's "agile" response to the pandemic. While Torrid experienced negative comparable sales growth in the first two fiscal quarters of 2020 ((38%) and (2%), respectively) due to reduced demand and temporary store closures during the COVID-19 pandemic, comparable sales growth accelerated over the next three fiscal quarters leading up to the IPO (third quarter 2020, fourth quarter 2020, and first quarter 2021): 4%, 8%, and 24% (compared to first quarter 2019), respectively. Torrid attributed this comparable sales growth to initiatives including investing in omni-channel offerings and a shortening the Company's product development cycle.

***Extreme Shipment Delays and Large Pre-IPO Inventory Orders Caused a Significant Accumulation of Excess Inventory Throughout the Relevant Period***

76.    In late 2020, Torrid began experiencing severe shipment delays—in some cases up to three months—due to port congestion in Long Beach and Los Angeles and factory closures in Asia where the Company sourced most of its merchandise.

77.    According to FE 1, the Company was experiencing constant inventory issues leading up to the IPO. In addition to the shipment delays, the Distribution Center lacked the necessary personnel to process the late inventory as it was received. As a result, just prior to the IPO, the Company had millions of unfulfilled customer orders. FE 1 recalled that backlogged orders were taking up to three months to fill.

78.    The delayed shipments further caused Torrid to miss seasonal launches, forcing the Company to sell the seasonal products at discounted prices as they became obsolete. As FE 1 reported, the delayed inventory would only eventually sell at promotional events, including "flash sales," during which Torrid offloaded its excess inventory at deeply discounted prices for a limited time.

***Torrid Abandoned Its Low-Risk Merchandising Model, Compounding the Company's Inventory Issues***

79.     In the months leading up to the IPO, Torrid become unable to quickly adjust to consumer demand as the lead-time for the manufacture of its products dramatically increased. As a result, the Company abandoned its low-risk merchandising model and instead began purchasing large quantities of product upfront.

80.    Also, by the time of the IPO, Torrid had been exceeding merchandise levels for certain styles, including Basics and Core, rather than expanding its assortment of new products, further exacerbating the Company's inventory issues. This, in conjunction with Torrid abandoning its low-risk merchandising model, caused the Company's inventory-to-sales ratio to skyrocket. By early 2022, Torrid's inventory had increased 61% from the prior year while sales had only increased 7.81% over the same period.

***The IPO***

81.    On June 7, 2021, Torrid filed the Registration Statement on Form S-1 with the SEC

in connection with the IPO. The Registration Statement was signed by Defendants Muñoz, Wehlitz, Harper, Kaluzny, and Kopelioff.

82.    On June 23, 2021, Torrid announced that the Company would be initiating the Roadshow in the week leading up to the IPO to generate investor interest in the public offering. Torrid pitched the Company to investors, presenting on Torrid's past and forecasted financial performance using a prepared slideshow presentation (the "Roadshow Presentation").

83.    After two amendments, the Registration Statement became effective on June 30, 2021. Torrid completed its IPO on July 1, 2021, selling more than $265 million of common stock to the public.

84.    Torrid's IPO, however, was unlike most traditional IPOs that raise money for the issuing business to fund continued operations and fuel potential growth. In fact, while Torrid incurred at least $6 million in costs in connection with the IPO, the Company itself did not actually make any money from the IPO of its common stock. Rather, each of the 12,650,000 shares of Torrid common stock were sold by insiders, including Company executives and current and former members of the Board and Torrid's parent company, Sycamore. Collectively, the Insider Trading Defendants reaped more than $230 million in proceeds from these insider sales.

***False and Misleading Statements***

    **A)**    **False and Misleading Statements and Omissions Made in Connection with the IPO**

        **(1)**    **False and Misleading Statements and Omissions Regarding the Company's Data-Driven, Low-Risk Merchandising Model**

85.    The Roadshow Presentation touted Torrid's merchandising model, referring to the Company's "[d]ata-[d]riven, [l]ow-[r]isk [m]erchandising [m]odel" as one of the IPO's "Investment Highlights." The Individual Defendants characterized Torrid's merchandising model

as "highly responsive" and promoted the Company's "read-and-react testing approach."

86.     The Individual Defendants highlighted the merchandising model throughout the

Registration Statement, touting Torrid's purported "flexibility to respond quickly to the latest sales

trends":

> We employ a data-driven approach to design, merchandising and inventory planning and allocation to deliver high quality products
>
> * * *
>
> We leverage this robust customer data along with market trends to inform all purchasing decisions. Through our vertical sourcing model, we have the flexibility to respond quickly to the latest sales trends and make adjustments to our current offering based on customer feedback to deliver product our customer wants.

87.     The Registration Statement claimed that Torrid's "read-and-react testing approach"

allowed the Company to "minimiz[e] fashion and inventory risk":

> Further, we utilize a read-and-react testing approach with shallow initial buys to iterate our New product offering, thus minimizing fashion and inventory risk. Our merchandising strategy has enabled us to generate approximately 80% of our net sales from products sold at regular price, which we define as products sold at initial ticket price or with a standard marketing promotion (e.g., "Buy One Get One 50% Off"). We believe our data-driven approach will continue to drive market growth and market share gains with our rapidly growing and underserved customer base.

88.     The Registration Statement further stated that Torrid had:

> [A] rigorous discipline around inventory performance by establishing clear guidelines on in-season product performance, item-level assortment planning and formal product hindsight reviews. As we have executed on these [merchandise] strategies, we have seen substantial growth across all major product categories, as shown in the graph below, and healthy gross profit margin performance. Our disciplined planning and product lifecycle management strategies enable effective in-season inventory management to maximize inventory turn and productivity. Through these practices, we are able to limit markdowns, which we define as permanent price reductions, allowing us to maximize our gross profit margin.

89.     The Registration Statement also highlighted Torrid's "Enhanc[ed] Supply Chain

Flexibility" as a result of the "speed model" which purportedly allowed the Company to

"accelerate product replenishment cycles, improve inventory turnover and drive higher margins sales."

90.    With respect to the inventory risks associated with Torrid's merchandising model, the Registration Statement stated:

> **Inventory levels for certain merchandise styles may exceed planned levels**, leading to higher markdowns to sell through excess inventory and, therefore, lower than planned margins. Conversely, **if we underestimate consumer demand for our merchandise, or if our manufacturers fail to supply quality products in a timely manner, we may experience inventory shortages**, which may negatively impact customer relationships, diminish brand loyalty and result in lost sales.

> \*\*\*

> **If the distribution facilities servicing our business were to encounter difficulties . . . we could face shortages of inventory in our stores, delayed shipments to our e-Commerce customers** and harm to our reputation.[3]

91.    The Individual Defendants' statements in the Registration Statement regarding Torrid's merchandising model were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Torrid began experiencing increased shipment delays in late 2020—in some cases up to three months—as a result of factory closures and port congestion; (ii) the shipment delays caused Torrid to miss seasonal launches, causing further inventory accumulation and forcing the Company to sell the obsolete products at discounted prices; (iii) the Company ultimately abandoned its low-risk merchandising model and was thus unable to make data-driven decisions, perform read-and-react testing, or use its speed model in the months leading up the IPO; and (iv) as a result of the foregoing, Torrid began purchasing large quantities of product upfront and exceeding planned merchandise levels, causing further accumulation of excess inventory.

### (2)    False and Misleading Statements and Omissions Regarding the

---

[3] Unless indicated otherwise, all emphases are added.

**Distribution Center**

92.    The Registration Statement claimed that the Distribution Center had sufficient capacity to "handl[e] our existing and future needs" and promote sustained growth:

> We acquired the operations of the fully-functional, ***state-of-the-art distribution center*** in West Jefferson, Ohio in 2018. This 750,000 square foot facility is highly automated and we believe is ***capable of handling our existing and future needs***. Additionally, the West Jefferson facility is . . . continuing to drive efficient online returns and position us to execute on our unified commerce strategy.

93.    The Individual Defendants' statements in the Registration Statement regarding the Distribution Center were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that, at the time of the IPO, the Distribution Center lacked sufficient capacity and personnel to process the massive volume of incoming inventory in a timely fashion, and as a result, millions of customer orders remained unfulfilled in the months leading up the IPO.

**(3)    False and Misleading Statements and Omissions Regarding the COVID-19 Pandemic**

94.    On a slide highlighting Torrid's "accelerating margin profile" and "rapid profitability and earnings growth," the Roadshow Presentation stated that the Company had demonstrated "strong resiliency amid the COVID-19 pandemic." The Roadshow Presentation attributed this purported resiliency to certain "key initiatives" implemented during that time, including a "shortened product development cycle." The Individual Defendants further stated that Torrid's "agile response to COVID led to sequential improvement in comp sales growth."

95.    While the Registration Statement recognized that Torrid's supply chain and operations had been adversely impacted by the COVID-19 pandemic, it misleadingly portrayed these issues as effectively resolved, stating that: "[i]n response to the COVID-19 pandemic, Torrid proactively implemented various industries with a focus on ensuring the health and safety of

employees and customers, minimizing the financial impact of COVID-19 and continuing to build the foundation for future growth and profitability."

96.    With respect to Torrid's speed model for product development, the Registration Statement stated that the Company "[m]ade targeted investments and changes to our process to improve the speed and flexibility of our supply chain including shortening our development cycle by two weeks."

97.    The Registration Statement further stated that Torrid was driving higher margins by "[l]everag[ing] data analytics and insights to tailor marketing and promotional strategies in response to consumer behavior changes related to the ongoing COVID-19 pandemic."

98.    The Individual Defendants indicated that Torrid had recovered from the impacts of the COVID-19 pandemic: "[i]n 2020, Adjusted EBITDA declined 24% year-over-year to $101 million driven by *temporarily* lower gross profit margin. . . . By May 2020, net sales growth *began to rebound*," demonstrating "the strong inherent demand for [the Company's] differentiated product and the resiliency of [its] business model."

99.    The Individual Defendants' statements in the Registration Statement detailed above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that, at the time of the IPO, Torrid had already abandoned its data-driven, low-risk merchandising model. Further, due to increasing manufacture lead times, Torrid was purchasing large amounts of its products upfront and exceeding planned merchandise levels for certain styles to ensure sufficient stock on-hand, leading to further accumulation of inventory. To offload the excess inventory, the Company was forced to use promotions and flash sales at discounted prices, adversely impacting the Company's revenues and gross margins.

B)    **False and Misleading Statements and Omissions in Torrid's Second Quarter 2021 Form 10-Q and Earnings Call**

100.    On September 8, 2021, after the market closed, Torrid announced its financial results for the second quarter of 2021 on a Form 10-Q signed by Defendants Muñoz and Wehlitz (the "2Q 2021 Form 10-Q").

101.    With respect to Torrid's merchandising model, the 2Q 2021 Form 10-Q stated:

> ***Our strategy is built around a consistent and stable base of core products*** that provide our customer with year round style. At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise*** to keep our customer engaged, encourage repeat business and attract new customers. ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product reviews.

102.    That same day, Torrid held its first earnings call as a publicly traded company (the "2Q 2021 Earnings Call"). During the 2Q 2021 Earnings Call, the Individual Defendants reported strong financial results for the second quarter of 2021 and signaled continued growth into the second half of 2021 despite the supply chain disruptions affecting the retail industry.

103.    During the 2Q 2021 Earnings Call, Defendant Wehlitz reported increased gross margins for the second quarter of 2021, resulting from fewer mark-downs in the quarter:

> ***Gross profit in the second quarter was $150 million or 45% of net sales compared to $80 million or 32.1% of net sales in the second quarter of 2020 and $103 million or 39.8% of net sales in the second quarter of 2019***. This nearly 1,300 basis point expansion in our gross profit rate from the prior year was primarily due to an improved product margin resulting from less discounting during the quarter as compared to the prior year. Our gross profit also benefited from leveraging distribution expenses, store occupancy costs and store depreciation expenses.

104.    With respect to Torrid's third quarter and fiscal year 2021 guidance, Defendant Wehlitz stated:

> For the third quarter, we expect net sales to be between $305 million to $350 million and adjusted EBITDA to be between $47 million and $52 million. Our guidance

assumes more modest gross margin expansion than we delivered in the second quarter, reflecting current trends as well as anticipated impact of supply chain challenges.

* * *

For fiscal 2021, we expect net sales between $1.29 billion to $1.3 billion and adjusted EBITDA between $248 million and $258 million. This assumes gross margin pressures in the back half of the year from the supply chain challenges, as I previously referred to.

105.    Despite the assumed "gross margin pressures in the back half of [2021]," analysts interpreted Torrid's guidance as better than expected. For instance, analysts from Telsey Advisory Group reported on September 9, 2021 that Torrid had provided "Better-Than-Expected FY2021 Guide," and added that the Company's "[t]hird quarter guidance [was] above expectations." Analysts from Jefferies referred to the guidance as "robust," stating that "the [Company] was able to guide well-ahead of cons[ervative]/previous plan." William Blair analysts stated that Torrid's third quarter guidance was "7% ahead of the consensus estimate."

106.    During the 2Q 2021 Earnings Call, Muñoz again touted Torrid's merchandising model and the Company's purported ability to quickly respond to consumer demand:

> **[O]ur data-driven low-risk merchandising model helps us provide a broad assortment of proprietary products with a distinct style**, and we provide them when and where she wants them. **Our flexible operating model allows us to quickly read and react to our customers' preferences** and to consistently meet her needs for great-fitting quality product at a tremendous value. Our close relationships with our customers provide us with constant valuable feedback that we deploy to continually provide her with the things she needs and wants.
>
> We further leverage this feedback and our extensive fit capabilities to expand into categories that drive high loyalty, such as blue jeans, bras, swim and shoes. **The effectiveness of our merchandising strategy is illustrated by our ability to grow our business across all of our categories year after year as well as by our consistently high penetration of regular-priced sell-throughs at over 80% of our total sales and also supported by our wildly low 9% return rate**.

107.    The Individual Defendants' statements in the 2Q 2021 Form 10-Q and the 2Q 2021

Earnings Call were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) prior to the IPO, Torrid was forced to abandon its data-driven, low-risk merchandising model as a result of increasing manufacturer lead times and shipment delays; (ii) as a result of Torrid abandoning its merchandising model, the Company was unable to perform read-and-react analysis on its products or use its speed model during the Relevant Period; (iii) as a result of the loss of these capabilities, Torrid began purchasing large volumes of product upfront and exceeding planned merchandise levels, causing the Company's inventory to accumulate further; (iv) as confirmed by FE 2, the Distribution Center was inundated with inventory and lacked the resources or personnel to process it in a timely fashion; and (v) the shipment delays caused Torrid to miss seasonal launches during the Relevant Period, causing a build-up of obsolete inventory and forcing the Company to resort to promotional activities, including "flash sales," to offload the inventory at discounted prices.

***The Truth Is Revealed Over Several Partially Corrective Disclosures***

108.    Over the course of the next year, the truth gradually emerged over several partially corrective disclosures. However, the Individual Defendants would continue to issue false and misleading statements and conceal the full truth with respect to the shipment delays and the Company's inventory management issues, causing the price of Torrid's stock to remain artificially inflated.

**A)    Third Quarter 2021 Form 10-Q and Earnings Call**

109.    On December 8, 2021, after the market closed, Torrid announced its financial results for the third quarter of 2021 on a Form 10-Q signed by Defendants Muñoz and Wehlitz (the "3Q 2021 Form 10-Q").

110. With respect to Torrid's merchandising model, the 3Q 2021 Form 10-Q repeated verbatim the language contained in the 2Q 2021 Form 10-Q:

> ***Our strategy is built around a base of core products*** that provide our customer with year round style. At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise*** to keep our customer engaged, encourage repeat business and attract new customers. ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product reviews. We engage in ongoing dialogue with customers through social media and customer surveys. ***Shifts in inventory levels may result in fluctuations in the amount of regular price sales, markdowns, and merchandise mix, as well as gross margin***.

111. That same day, during an earnings call (the "3Q 2021 Earnings Call"), Defendant Wehlitz reported margin growth in the third quarter "primarily driven by reduced promotional activity and pricing initiatives." Wehlitz further reported third quarter sales at the low end of the Company's guidance due to shipment delays. The Individual Defendants also announced that Torrid was narrowing its fourth quarter and fiscal year 2021 guidance due to inflation headwinds and continued shipment delays.

112. During the 3Q 2021 Earnings Call, the Individual Defendants continued to issue false and misleading statements, obscuring Torrid's mixed third quarter results and causing continued inflation of the price of Torrid's stock. Specifically, during the call, the Individual Defendants claimed that Torrid was: (i) still using its low-risk merchandising model; (ii) mitigating supply chain disruptions; (iii) not experiencing serious inventory issues; and (iv) using promotional activities in the fourth quarter of 2021 strategically rather than as a means of offloading excess inventory.

113. During the 3Q 2021 Earnings Call, Defendant Muñoz claimed that Torrid was mitigating supply chain disruptions with its "powerful and nimble operating model" of which the

Company's low-risk merchandising model was a key component. Defendant Muñoz continued:

> We have strong long-term vendor relationships and a diversified manufacturing base, and we are working closely with our partners to mitigate the current challenges. Our priority is getting our products into the U.S. and specifically into our customers' hands in addition to managing the costs associated with these deliveries. As always, we are focused on delivering for our customer and meeting her needs despite the current operating environment. While we expect supply chain headwinds to continue at least into the first half of 2022, we are successfully navigating the current environment and our underlying operating model remains strong.

114.    On the 3Q 2021 Earnings Call, Defendant Wehlitz reiterated that Torrid was taking active steps to mitigate the supply chain disruptions:

> We are closely monitoring the situation and continuing to take proactive measures to mitigate the impact, including selectively air freighting goods and placing orders earlier as well as offsetting some of the associated cost pressures by consolidating fabric orders and selectively increasing prices. While we are taking proactive measures to manage our supply chain, many of these initiatives will not begin to benefit until starting early next year.

115.    During the 3Q 2021 Earnings Call, Defendants Wehlitz and Muñoz claimed that Torrid's increased promotional activity in the fourth quarter was "very strategic" and was used as a "customer engagement tool," when in fact, the Company had been using the promotions to offload its excess inventory:

> [Wehlitz:] ***In Q4 specifically, in general for Q4, the promotional activity is higher. Again, we don't necessarily play the same seasonal issues that other retailers have but we do have to play in the arena of Black Friday and Cyber Monday events. That promotional activity is typically deeper, and that does bring down the – that increase the promotional rate for that quarter compared to other quarters***. But it's not a new anomaly for us as we're having to play with the bigger and broader macro issues there. And then from a promotional standpoint, in general, we do use it, as we've said, more of a customer engagement tool and really trying to keep her engaged along the way in that journey of what we're doing. So Liz, will you add to that?

> \* \* \*

> [Wehlitz:] ***[R]elated to the promotions a bit for Q4. So yes, we'll selectively look at the promotions related to truly seasonal goods. But I think we're very happy***

*with our – as we're getting our inventory and how we're positioning ourselves as we go into Q1, and being very strategic about how we're doing promotions to try to make sure that we're mitigating as much as that product as possible that might have a shorter shelf life as far as seasonal goods.*

\* \* \*

[Muñoz:] *I think it's just important to get that point across, and George made it that we use promotions in a different way. We don't necessarily use promotions to drive product that's not working or things like that. We use them as an engagement tool.*

116.    During the call, Defendant Wehlitz also stated that Torrid was maintaining "adequate inventory levels":

> Inventory at the end of the quarter was $159 million compared to $124 million last year and $140 million in the third quarter of 2019. Excluding in-transit levels, our inventory was slightly down from prior year. Although our available inventory is modestly below optimal levels, we took measures to air freight and feel very comfortable with the adequate inventory levels to meet the consumer demand that is reflected in our fourth quarter forecast.

**B)    January 10, 2022 Press Release**

117.    On January 10, 2022, Torrid issued a press release announcing that the Company had lowered its fiscal year 2021 guidance due to labor challenges at its Distribution Center and retail stores resulting from the spread of the Omicron variant of COVID-19. That press release was included in the Company's Form 8-K filed with the SEC on January 12, 2022 and signed by Defendant Wehlitz.

118.    This reduced guidance was materially false and misleading and lacked a reasonable basis, as the Individual Defendants continued to conceal the Company's severe inventory management and supply chain issues.

**C)    March 17, 2022 Earnings Call and Fiscal Year 2021 Form 10-K**

119.    On March 17, 2022, after the market closed, Torrid held an earnings call (the "4Q 2021 Earnings Call") to discuss the Company's fourth quarter results. During the 4Q 2021

Earnings Call, the Individual Defendants announced better-than-expected guidance for the fiscal year 2022 and revealed that, in the fourth quarter of 2021, Torrid outperformed the lowered guidance given on January 10, 2021. The Individual Defendants further reported a decline in gross margins in the fourth quarter due to elevated freight and product costs, offset by higher pricing and reduced promotional activity. On the 4Q 2021 Earnings Call, Defendant Muñoz reported:

> Starting with our 2021 performance, ***net sales grew 31% versus 2020 and 23% versus 2019. Adjusted EBITDA increased by 144% over last year and 86% versus 2019, and adjusted EBITDA margin reached 19%. Importantly, we achieved these results in the face of pervasive supply chain challenges and cost pressures, demonstrating the strength of our brand and strong execution against our growth strategies***.

120. With respect to Torrid's promotional activity, Defendants Muñoz and Wehlitz reiterated that it was being used strategically as a customer engagement tool:

> [Muñoz:] As far as the promotional activity, we see promotional activity to be similar to '21. And we are focused on the promotional events that we know are part of our DNA, and they form a bond with our customer. They drive engagement. And I will tell you that a lot of these promotional events are also really good new customer acquisition tools. So things like Torrid Cash and the Love Your Bra event will continue. And then we use incentives to get customers in the categories we really want them to be in because they are very sticky like bras and blue jeans, and we've seen success in that. So I think it's going to continue as it's been, and we will adjust and address as it comes at us.

> [Wehlitz:] And then as a follow-up to what Liz said, yes, looking at '22 to be more of a normalized year related to that. But if you're looking compared to 2021, remember that the first half of the year, we were much more impacted by the stimulus and the pent-up demand. And there was less promotional activity going on because of what she was spending and she had available to spend. So it will be more of a normalized [year related to] that as we look more towards pre-COVID levels.

121. The Individual Defendants also stated that Torrid was taking initiative to mitigate supply chain disruptions by forming a "speed committee" to reduce lead times and increase efficiency:

We are also addressing supply chain challenges, which we expect to persist into 2022 by managing areas that are within our control. ***As part of these efforts, we have formed a speed committee, where we are analyzing our full production cycle in order to reduce lead times and increase efficiency***.

122.    Defendant Wehlitz continued to conceal Torrid's inventory management issues on the 4Q 2021 Earnings Call:

We feel comfortable with both our current inventory position and the flow of shipments as we continue to take proactive measures to mitigate the impact of shipping delays and higher transportation costs. We are placing orders earlier, consolidating fabric orders to get low pricing and selectively taking price increases. We are confident in our ability to continue to navigate the supply chain challenges facing us in our industry.

123.    In response to further probing regarding Torrid's inventory levels, Defendant Wehlitz stated:

So from a comparison with – at the end of the year 2021 compared to 2019, our inventory in total was up. ***But if you look at it from – and excluding in-transit, because, again, with this delay related to the supply chain and the transit times, it has increased what we have in-transit in the water, not in our buildings. You exclude that, we were up 12% compared to '19. So very in line with what we're looking at from a sales perspective.***

***We feel very good about what we have in inventory. We feel good about the composition of what we have in the inventory. And we feel good about what's coming in as well as what we factored in, again, as Liz said, timing-wise, trying to place orders earlier to get the product in. So I think from an inventory perspective, we have the inventory to be able to support higher sales than we have put into the guidance***. And I think from an inventory perspective, as we look throughout the year, I think we're going to – we would definitely be higher than we were in '19. But again, it will be moderated to what we think we can have from an investment standpoint of what's keeping ourselves current and in line with our expectations of where we're going to be to be able to support from a sales perspective.

124.    On March 30, 2022, after the market closed, Torrid filed its annual report on Form 10-K for the fiscal year ended January 29, 2022 with the SEC (the "FY 2021 Form 10-K").

125.    The FY 2021 Form 10-K emphasized Torrid's merchandise and inventory management systems, including the Company's "read-and-react" strategy:

> ***Our trend driven items incorporate the latest fashions available*** in the broader
> market to excite and engage our customer but are bought narrowly and reordered
> as demand dictates to minimize inventory risk.

* * *

> ***Our strategy is built around a consistent and stable base of Core products*** that
> provide our customer with year round style. At the same time, we introduce new
> lines of merchandise approximately 16 times per year, thus ***providing a consistent
> flow of fresh merchandise*** to keep our customer engaged, encourage repeat
> business and attract new customers.
>
> ***We regularly use the depth and breadth of our data to assess sales, market trends
> and new product development to inform purchasing decisions. As a result, we
> have the flexibility to react quickly to product performance, make in-season
> inventory purchasing adjustments where possible and to respond to the latest
> sales trends by ordering or re-ordering as appropriate. Further, we utilize a read-
> and-react testing approach, with small purchase quantities, to introduce our New
> product offering, minimizing fashion risk. This strategy also allows us to mitigate
> inventory risk, particularly for new products or styles, while simultaneously
> providing our customers access to current fashion***.

126.    The FY 2021 Form 10-K also highlighted Torrid's "fully-functional, state-of-the-

art distribution center":

> Our unified commerce business model is serviced by our distribution facility
> located in West Jefferson, Ohio. We acquired the operations of the ***fully-functional,
> state-of-the-art distribution center*** in West Jefferson, Ohio in 2018. This 750,000
> square foot facility is highly automated and we believe is ***capable of handling our
> existing and future needs***. Additionally, the West Jefferson facility is already
> equipped with omni-channel capabilities that have enabled our buy-online-pickup-
> in-store ("BOPIS") rollout while continuing to drive efficient online returns and
> position us to execute on our unified commerce strategy. During 2020 we also
> accelerated our omni-channel offerings such as ship from store and curbside
> pickup, which when combined with BOPIS will continue to drive both customer
> acquisition and retention.
>
> Our distribution center manages the transportation, receipt, storage, sorting,
> packing and distribution of merchandise for our e-Commerce platform and store
> channels. Stores are replenished at least once per week from these facilities by
> third-party delivery services. This frequency provides our stores ***a steady flow of
> new inventory that helps maintain product freshness and in-stock availability***.

**D)     First Quarter 2022 Form 10-Q and Earnings Call**

34

127.    On June 7, 2022, after the market closed, Torrid announced its financial results for the first quarter of 2022 on its Form 10-Q filed with the SEC and signed by Defendant Harper (the "1Q 2022 Form 10-Q"). The 1Q 2022 Form 10-Q continued to tout the Company's inventory management system:

> *Our strategy is built around a base of core products* that provide our customer with year round style. At the same time, we introduce new lines of merchandise approximately 16 times per year, thus *providing a consistent flow of fresh merchandise to keep our customer engaged*, encourage repeat business and attract new customers. *We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information* alongside customer feedback from thousands of product reviews. We engage in ongoing dialogue with customers through social media and customer surveys.

128.    That same day, during an earnings call to discuss Torrid's 1Q 2022 financial results (the "1Q 2022 Earnings Call"), the Individual Defendants reported that the Company had outperformed its first quarter sales and adjusted EBITDA guidance.

129.    During the 1Q 2022 Earnings Call, the Individual Defendants provided disappointing second quarter 2022 guidance, stating that the second quarter "outlook assumes our gross margin rate will be below [the first quarter] as we clear through inventory heading into the back half of the year." The Individual Defendants, however, continued to mislead the public by: (i) reiterating the fiscal year 2022 guidance provided during the 4Q 2021 Earnings Call; (ii) stating that gross margins would improve in the second half of 2022; and (iii) maintaining that Torrid was comfortable with its inventory position.

130.    During the 1Q 2022 Earnings Call, interim CFO Tanner MacDiarmid ("MacDiarmid") confirmed Torrid's fiscal year 2022 guidance:

> *For the full year, we are maintaining our full year sales guidance of between $1.3 billion and $1.365 billion*. As Lisa stated, we are focused on creating a better balance of sales and margin in the business that is expected to moderate sales growth in the back half, while driving improvements in margin.

131.    During the 1Q 2022 Earnings Call, Defendant Harper acknowledged that the Company had not been using promotional activity strategically, as the Individual Defendants had represented. Defendant Harper stated however that moving forward, Torrid would "take a more surgical approach to promotions":

> In the past, our promotions have been largely broad-based offers to all customers and across categories, which was anchored heavily on percentage discount. Going forward, we plan to take a more surgical approach to promotions by closely aligning them with our merchandising and marketing strategies and our inventory investment. It will take time to refine these strategies, and we will maintain site-wise promotions in the near term while we test and react into more targeted promotions.

132.    During the 1Q 2022 Earnings Call, the Individual Defendants reported that inventory was up 51% in the first quarter of 2022, compared with 2019 levels, with 30% sales growth. The Individual Defendants further acknowledged the use of promotional activities by the Company to offload excess inventory. Despite these disclosures, the Individual Defendants maintained that they were "comfortable" with Torrid's inventory levels. Specifically, interim CFO MacDiarmid stated:

> So we are comfortable with the position of the inventories within remainder of the year. We are going to have to be more promotional in Q2 so that we're doing clean-off of our inventory heading to the post summer time frame. But we feel like we've planned receipts in the back half of the year such that we're going to be comfortable with our inventory position Q3 to Q4 time frame.

**E)    August 3, 2022 Press Release**

133.    On August 3, 2022 Torrid issued a press release lowering the Company's sales and adjusted EBITDA guidance for the second quarter of 2022 and announcing the appointment of a new CFO. In the press release, Defendant Harper stated:

> While we continue to make progress driving strategic initiatives that will support sustainable, profitable growth long term, we are reducing our sales and EBITDA guidance for the second quarter as we continue to navigate through the current

macro environment. Although our web traffic trends have been consistent, store traffic trends slowed in July and shipping disruptions caused by upgrades to our distribution platform during the quarter created unanticipated headwinds. The increased capacity in our fulfillment center is now operational and customers are receiving their orders as expected. ***Additionally, we were able to clear our projected levels of excess inventory and expect to have assortments in a balanced position by mid-September. Heading into the back half of the year, we remain focused on prioritizing margin through compelling new product, disciplined inventory management, and cost control through effective resource allocation***.

134.    Defendant Harper's statements indicating that the Company expects to be in a balanced inventory position by mid-September served to mollify analysts and the public. For example, on August 4, 2022, William Blair issued a report, stating: "Torrid has gotten its inventory levels under control after a quarter of more aggressive promotions, and view this as a transitionary quarter under a more radical shift in promotional and merchandise strategy under new management."

**F)    Second Quarter 2022 Form 10-Q and Earnings Call**

135.    On September 7, 2022, after the market closed, Torrid announced its financial results for the second quarter of 2022 on a Form 10-Q filed with the SEC and signed by Defendant Harper (the "2Q 2022 Form 10-Q"). In the 2Q 2022 Form 10-Q, the Individual Defendants continued to highlight the Company's inventory management system:

> ***Our strategy is built around a base of core products*** that provide our customer with year round style. At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise to keep our customer engaged***, encourage repeat business and attract new customers. ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product reviews. We engage in ongoing dialogue with customers through social media and customer surveys.

136.    That same day, during an earnings call to discuss Torrid's financial results for the second quarter of 2022 (the "2Q 2022 Earnings Call"), the Individual Defendants lowered Torrid's

fiscal year 2022 guidance. The Individual Defendants also reiterated that the Company would be in a balanced inventory position by mid-September and that margins would improve.

137.    On the 2Q 2022 Earnings Call, with respect to Torrid's inventory levels, Defendant Harper stated:

> I would say right now that we're really comfortable with the mix of inventory between clearance and regular price online. And we're at 2019 levels and store between a mix of clearance and regular price.

> We think that it is getting progressively better. And as I've mentioned, we're – the inventory purchased in the back half of the year is down 7% year-over-year. So we feel like that this quarter is the quarter where we're really dealing – the last quarter where we're dealing with this excess inventory issue. It will improve as we go into the back half of the third quarter as well as in the fourth quarter.

138.    Defendant Harper highlighted Torrid's promotional activity when discussing the Company's top priorities moving forward:

> This brings me to the 3 main priorities. Our first priority is to refine our marketing and our promotional strategy. We continue to believe that there's an opportunity to reduce site-wide promotions and to realign our marketing and merchandising strategy. As we move into the back half of the year, we'll be testing into more category-focused promotions based on price elasticity with the goal of reducing discounts on styles with the strongest natural demand.

> ***We're implementing these changes on site, and we started providing percentage discounts based on inventory and demand as opposed to blanket promotions. This is the first step in refining our promotional cadence and driving margin improvements***.

139.    Following the disappointing earnings report and the lowered guidance for fiscal year 2022, Morgan Stanley analysts observed a 12% decline in the price of Torrid's stock.

**G)    December 8, 2022 Earnings Call**

140.    On December 8, 2022 after the market closed, Torrid announced its financial results for the third quarter of 2022 and held an earnings call (the "3Q 2022 Earnings Call"). Despite the Individual Defendants' assurances that Torrid would achieve a balanced inventory position and

that margins would improve by the third quarter, the Individual Defendants again lowered net sales and adjusted EBITDA guidance for the fiscal year 2022, as Torrid "continue[d] to focus on reducing [its] inventory levels" because "[u]nfortunately, given [Torrid's] inventory position" the Company would have to resume its promotional activities to "continue to clear through product."

141.    On this news, the price of Torrid common stock declined more than 21%, to close at $3.35 per share on December 9, 2022.

**Harm to the Company**

142.    As a direct and proximate result of the Individual Defendants' misconduct, Torrid has lost and expended, and will lose and expend, millions of dollars.

143.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

144.    Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

145.    As a direct and proximate result of the Individual Defendants' conduct, Torrid has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

146.    As a result of the foregoing, on November 16, 2022, the Securities Class Action was filed, alleging claims for violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act.  The Securities Class Action has exposed the

Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

148.    Torrid is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

149.    Plaintiff is a current shareholder of Torrid and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

150.    At the time this action was commenced, the six-member Board was comprised of Director Defendants Kaluzny, Kopelioff, Harper, Killion, Nikolov, and Shaffer. Accordingly, Plaintiff is only required to show that three directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

151.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

152.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Torrid, the Director Defendants knew, or should have known, the material facts surrounding the shipment delays and the Company's inventory management issues.

154.    Defendants Shaffer, Killion, Nikolov, and Kopelioff are not disinterested or independent, and therefore, are incapable of considering a demand because they currently serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's financial condition and business prospects.

Therefore, Defendants Shaffer, Killion, Nikolov, and Kopelioff cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

155.    Furthermore, demand in this case is excused because each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

156.    The Individual Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct.  Thus, any demand on the current Board would be futile.

157.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Torrid. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Torrid, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and,

therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Torrid to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

159.    Accordingly, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants for Violations of § 10(b)
### of the and Rule 10b-5 Exchange Act

160.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

161.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

162.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements in the Registration Statement, the Company's SEC filings and earnings reports, and other public disclosures and failed to disclose material facts in order to make the statements made, in light of the circumstance under which they were made, not misleading.

163.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

164.    As a result of the foregoing, the price of Torrid common stock issued in the IPO was artificially inflated. In ignorance of the falsity of the statements, Plaintiff relied on the representations in the Registration Statement in purchasing Torrid common stock at a price that was artificially inflated as a result of these false and misleading statements and was damaged thereby.

165.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II
### Against the Individual Defendants for
### Breach of Fiduciary Duty

166.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

167.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

168.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

169.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

170.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

171.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

172.    Plaintiff, on behalf of Torrid, has no adequate remedy at law.

**<u>COUNT III</u>**
**Against the Insider Trading Defendants for**
**for Breach of Fiduciary Duty (*Brophy*)**

173.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

174.    At all relevant times, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding their duty to refrain from trading in Torrid's common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

175.    The insider sales began during and continued throughout the class period in the

45

Securities Class Action indicating they were not originally part of any regular pattern of sales for the Insider Trading Defendants.

176.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Torrid stock. At the time of their stock sales, these Defendants were aware of the material facts surrounding the Company's merchandising model, inventory, and the Distribution Center, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

177.    As detailed herein, the Insider Trading Defendants were in possession of material non-public information concerning Torrid at the time of the IPO. The Insider Trading Defendants exploited their insider knowledge to sell more than $230 million worth of Torrid stock at artificially inflated prices.

178.    Plaintiff on behalf of Torrid has no adequate remedy at law.

## COUNT IV
**Against the Individual Defendants for**
**Aiding and Abetting Breach of Fiduciary Duty**

179.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

180.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

181.    Plaintiff, on behalf of Torrid, has no adequate remedy at law.

**<u>COUNT V</u>**
**Against the Individual Defendants for**
**Unjust Enrichment**

182.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

183.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Torrid.

184.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Torrid that was tied to the performance or artificially inflated valuation of Torrid, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

185.    Plaintiff, as a shareholder and a representative of Torrid, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186.    Plaintiff, on behalf of Torrid, has no adequate remedy at law.

**<u>COUNT VI</u>**
**Against the Individual Defendants for**
**Waste of Corporate Assets**

187.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

188.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Torrid's internal controls, by issuing, causing the issuance

of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

189.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action.

190.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf Torrid, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2023

**RIGRODSKY LAW, P.A.**

By: _/s/ Seth D. Rigrodsky_
‎      Seth D. Rigrodsky (#3147)

Of Counsel:                                Gina M. Serra (#5387)
‎                                                   Herbert W. Mondros (#3308)
Joshua H. Grabar                          300 Delaware Avenue, Suite 210
**GRABAR LAW OFFICES**             Wilmington, DE 19801
One Liberty Place                          Telephone: (302) 295-5310
1650 Market Street, Suite 3600       Facsimile: (302) 654-7530
Philadelphia, PA 19103                   Email: sdr@rl-legal.com
Telephone: (267) 507-6085            Email: gms@rl-legal.com
Email: jgrabar@grabarlaw.com       Email: hwm@rl-legal.com

‎                                                   *Attorneys for Plaintiff*

49